UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BROOKRIDGE FUNDING CORP.

Plaintiff

v.

AQUAMARINE, INC,., a successor in interest to Euclase, Inc. through merger, EUCLASE, INC., and JOSEPH CURLEY

Defendants

CIVIL ACTION
NO. 09-10489-WGY

MEMORANDUM AND ORDER

YOUNG, D.J. December 30, 2009

China has had a significant fishing industry since time immemorial. *See generally* G.R.C. Worcester, The Junks & Sampans of the Yangtze, 180, 182, 262-273, 417 (Naval Inst. Press, 1971) (discussing especially the Liu-Wang-Chuan or Fish Carrier, p. 180; the Chusan Little Fisherman, p. 182; Fishing Sampans, pp. 262-273; and the Tungting Lake Fisherman, p. 417). In America, the magnificent fishing grounds of the Grand Banks were fished commercially years before any Northern European nation established a permanent settlement in the New World. Douglas Hunter, Half Moon 88-89 (2009) (On a voyage of exploration, Henry Hudson loses his way off the Isle of Shoals, falls in with a fleet of French fishing vessels, and speaks one of them, asking

"Where am I?"). Today, the overfishing of those same fishing grounds and the consequent eclipse of America's fishing industry, *see generally* John N. Cole, Striper (The Lyons Press 1989), have led our nation to import increasing quantities of fish from China.

One would think, therefore, that the big American producers of frozen fish products would buy fish directly from Chinese fish processing plants. Apparently that's not the way it works. Instead, fish brokers establish contacts with the major Chinese fish processing plants and buy large quantities of frozen fish in multi-container lots for expected distribution to the American market. At the same time, fish brokers (either the same or different brokers) who have contacts with American producers of frozen fish products solicit large quantity orders for particular types of fish and fill those orders with fish available directly from Chinese fish processors or from fish brokers who have such fish.

Certain fish brokers finance their operations through purchase order financing. That is, some financing sources will loan money secured by actual purchase orders, i.e. purchase order financing. This seems like a sound investment. After all, the broker has in hand an actual order from a reputable American firm and the investor believes the broker has the contacts and skill to purchase the requisite fish to fill the order.

Usually, everyone in the chain makes money. Sometimes they do not and lawsuits result. This is one.

**I. Findings of Fact**

Daewoo Co., Ltd., Dalian Hualin Food Co., Ltd., and Dalian Yingjie Foods Co., Ltd. are all Chinese fish processing plants.

Among other brokers, they sell fish to Phoenix Seafood Ltd. (“Phoenix”). Phoenix has headquarters in Tortola, British Virgin Islands. Its principal is one Ketill Helgason (“Helgason”).

Helgason in turn regularly sold fish to Seascape Seafood, Inc. (“Seascape”), a corporation with headquarters in Rhode Island. Its principal is one Hal Einarsson. Seascape used Frost National Bank in Houston, Texas for its international financial transactions and had an employee, Chasity Mourey, in Houston who was skilled in such transactions. Seascape also employed Joseph Curley as a salesman.

Seascape had established a business relationship with King & Prince, a major American producer of fish products and frequently sold it fish. In order to conduct this business, Seascape regularly entered into purchase order financing arrangements with Brookridge Funding Corp. (“Brookridge”). Once Seascape had a valid purchase order from King & Prince, Brookridge would advance funds to Seascape to acquire the fish King & Prince had ordered. Brookridge would take a security interest in the purchase order and would be repaid (with interest) from the funds paid by King &

Prince when Seascape supplied the fish that had been ordered.

From July 26, 2006, to September 12, 2006, Brookridge advanced to Seascape $570,400 to enable it to purchase fish for King & Prince to fill eleven separate purchase orders. Brookridge had a duly recorded security interest in each of these purchase orders.

For whatever reason, Seascape abruptly went out of business without completing the purchase of fish to fill these eleven purchase orders.

Phoenix, however, already had purchased in China the fish necessary to fill these purchase orders and the fish was en route by ship to the United States. Helgason sprang into action. He already had a New Hampshire corporation, Euclase, Inc. (later merged into Aquamarine, Inc.) that was also engaged in the fish brokerage business. Euclase/Aquamarine (they are actually one and the same) had as president one Vaughn Tamzarian, an attorney working part-time in the fish brokerage business. While Phoenix, Euclase, and Aquamarine outwardly observed the corporate forms, the Court finds they were all actually controlled by Helgason and acted in such concert under Helgason’s direction that the corporate form may be disregarded.

Helgason immediately had Mourey and Curley hired by Euclase. More important, he had an approach made to King & Prince and it simply substituted the name “Euclase” for “Seascape” on the

purchase orders. When the fish arrived in the United States, Euclase shipped the fish to King & Prince and it duly paid Euclase the purchase price, which Helgason pocketed after paying off Euclase’s financing source and the other normal transaction costs.

Brookridge – out $570,400 – swung into action in its turn. First it sued Seascape in Rhode Island and, with Einarsson claiming the Fifth Amendment, secured an apparently empty judgment. Having failed to obtain recovery in its action against Seascape, on March 31, 2009 Brookridge – informed that container loads of fish consigned to Aquamarine were arriving dockside in Boston – promptly commenced this action in the District of Massachusetts seeking, inter alia, an ex parte Temporary Restraining Order and Trustee Process. Evidently, Brookridge sought the equivalent of an equitable lien to tie up the fish in order to exert economic pressure on Aquamarine/Euclase.

This Court held a hearing on the following day. Aquamarine/Euclase appeared to defend. As is its wont, the Court, believing that nothing so concentrates the trial lawyer’s mind as the prospect of a trial on the morrow,[1] “advance[d] the trial on the merits and consolidate[d] it with the hearing” on the preliminary injunction. Fed. R. Civ. P. 65 (a)(2). Six days

---

[1]With apologies to Samuel Johnson, "Depend upon it, Sir, when a man knows he is to be hanged in a fortnight, it concentrates his mind wonderfully." James Boswell, Life of Samuel Johnson, LL.D. 748 (Everyman's Library, Random House 5th prtg. 1992) (1791).

later, the Court held a final pre-trial conference and Brookridge’s claims began unraveling. The Court dismissed the claim made under Mass. Gen. Laws. Ch. 93A, § 11 and it became evident that Brookridge had no viable claim against Curley.

Trial commenced on Tuesday, March 14, 2009, two weeks to the day after Brookridge filed its complaint. After three days of presenting evidence, Brookridge rested.[2] Aquamarine/Euclase moved for judgment on partial findings. Fed. R. Civ. P. 52(c)

At this point, it was undisputed that Brookridge held a valid security interest in eleven purchase orders for fish from King & Prince to Seascape upon which it had advanced $570,400 – a sum Seascape never repaid.[3]

Brookridge’s security interest attached to the purchase orders themselves, i.e. the eleven contracts between King & Prince and Seascape for the purchase and sale of certain quantities and types of fish. The security interest would also attach to the fish itself once Seascape came into possession of the fish to fulfill those orders. This Court finds no credible evidence, however, and remains unpersuaded, that Seascape ever came into possession of the fish necessary to fill these eleven purchase orders. Accordingly, Brookridge cannot claim some interest in the fish itself.

---

[2]The Court took evidence in this case on Tuesday April 14, Wednesday April 15, and Thursday April 30, 2009.

[3]These matters remain undisputed.

True, Brookridge had a security interest in the commercial paper, the purchase orders themselves. But those orders were not themselves the subject of some commercial transaction between Seascape and anyone else. Rather, when Seascape abruptly went out of business, it simply defaulted on its obligations to fill those orders.

The relative ease with which Helgason substituted rewritten purchase orders between King & Prince and Aquamarine/Euclase for the defaulted orders from Seascape (as well as his immediately snapping up Mourey and Curley to continue in their same jobs only now working for Aquamarine/Euclase) raised a strong suspicion in the mind of this Court that all these various corporations – Phoenix, Seascape, Euclase, and Aquamarine – were in fact not only controlled by Helgason but that he disregarded the corporate form to suit himself. Were this the case, of course, Brookridge could maintain a variety causes of action against Aquamarine/ Euclase.

Suspicion, however, even strong suspicion, is not evidence. While the Court finds that Helgason controlled Phoenix, Euclase, and Aquamarine and disregarded the corporate form among them, the Court was not at that juncture persuaded and did not find that Seascape was anything other than a wholly independent corporation controlled by Einersson.

Accordingly, on April 30, 2009, this Court found for

Aquamarine/Euclase on all Brookridge's claims, save for unjust enrichment (i.e. that some or all of Brookridge's $570,400 loan provided an economic benefit to, or found its way into the coffers of, a Helgason controlled company) and found for Curley on all Brookridge's claims.

Aquamarine/Euclase presented some evidence and, complaining that it needed Frost National Bank records to bolster its defense, rested with that proviso. Brookridge likewise chafed at the Court's expeditious handling of the case and wanted more time for discovery from the non-party Frost National Bank.

In view of its suspicions, the Court allowed such further discovery,[4] reviewed additional evidentiary material, entertained final arguments on June 11, 2009, and thereafter received and closely scrutinized post trial briefs.

This additional evidence leads the Court to conclude that Phoenix and Seascape held themselves out to King & Prince as a joint enterprise. Larry Welch, Director of Quality Assurance for King & Prince, testified that he considered Phoenix and Seascape to be the same, and that Seascape was merely the marketing arm of

---

[4] While this Court, pursuant to Fed. R. Civ. P. 65 (a)(2), routinely advances the trial on the merits for determination with any claim for injunctive relief, this case illustrates how the quest for efficiency perhaps interferes with the far more important quest for justice. This case got tried back end to without the most significant discovery.

Accordingly, the Court – in light of this case – has altered its standard practice. Since this case was tried, the Court, when considering a motion for preliminary injunction, routinely asks the plaintiff when it wishes to go to trial suggesting that no preliminary relief will be afforded without trial. In that way, plaintiffs are not immediately forced off the precipice into a trial they may not want, settlement discussions may take place, and vital discovery may ensue. Of course, if immediate irreparable injury is in the offing, the plaintiff will necessarily ask for an immediate trial. Once the plaintiff selects a trial date, the Court inquires of and considers the interests of the defendant.

Phoenix. Ex. 37, Welch Depo. At 13. Similarly, Paul Obirek, the Director of Procurement for King & Prince, considered Euclase and Seascape to be "one and the same." In fact, even after Aquamarine/Euclase stepped into the shoes of Seascape as to these eleven purchase orders, Obirek continued to deal with Einarsson. Ex. 34, Obirek Dep. at 19. Obirek considered Phoenix a business partner engaged in a joint venture with Seascape and Aquamarine/Euclase Id. at 21, 22. Indeed, as late as April 16, 2007, Mourey – following up for Einarsson with King & Prince concerning other containers of fish – called Aquamarine/Euclase "sister companies to Seascape." Ex. 40.

An exhaustive review of the entire evidentiary record, all the available invoices, bills of lading, and Frost National Bank wire transfers also leads the Court to two disparate evidentiary findings.

First, Brookridge has successfully proved that, save for commissions, its funds – all $570,400 of its loans – were ultimately wired by Seascape to various Chinese fish processing plants to pay for fish purchased by Phoenix from those plants. The documents that undergird these wire transfers – the documents of transfer, the bills of lading, the bills of exchange – all pertain, however, to fish purchased by Seascape prior to Brookridge funding Seascape for the purchases necessary to fill the eleven King & Prince purchase orders at issue here. *See*,

*e.g.*, Def. App. 36-41. None of the container numbers of fish that Aquamarine/Euclase provided to King & Prince are contained in the Frost National Bank records.

Second, all of the funds used by Aquamarine/Euclase to pay for the eleven invoices at issue in this case came from a funding source wholly independent from Brookridge. Trial Tr. 62-84 (Apr. 30, 2009), Exs. 23, 31. Def. App. 18, 19A, 31, 50, 53, 56, 61, 62, 68, 69, 70, 72.

## II. Rulings of Law

Brookridge vigorously seeks to confirm the Court's suspicion that Helgason controlled Seascape in the same manner that he controlled Phoenix, Aquamarine, and Euclase. As Seascape is a corporation, one would have expected Brookridge to follow the recognized protocol for piercing the corporate veil.

> A corporation or other person controlling a corporation and directing, or participating actively in (see *Refrigeration Discount Corp. V. Catino*, 330 Mass. 230, 234-236), its operations may become subject to civil or criminal liability on principles of agency or of causation. See *Commonwealth v. Abbott Engr. Inc.* 351 Mass. 568, 579-580. See also *Rock-Ola Mfg. Corp. v. Music & Television Corp.* 339 Mass. 416, 422-423. This may sometimes occur where corporations are formed, or availed of, to carry out the objectives and purposes of the corporations or persons controlling them. See *Rice v. Price*, 340 Mass. 502, 511-512; *Centmont Corp. v. Marsch*, 68 F. 2d 460, 464-465 (1st Cir.), cert. den. 291 U.S. 680. See also *Finnish Temperance Soc. Sovittaja v. Finnish Socialistic Publishing Co.* 238 Mass. 345, 354-356; *Henry F. Mitchell Co. v. Fitzgerald, ante,* 318, 321-322. The circumstances in which one corporation, or a person controlling it, may become liable for the acts or torts of an affiliate or a subsidiary under common

> control have been frequently discussed. Although common ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees, additional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities. Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

My Bread Baking Co. v. Cumberland Farms, Inc. 353 Mass. 614, 618-619 (1968) (Cutter, J.)

Brookridge, however, eschews this route and seeks to reach the same conclusion by emphasizing that Seascape, Phoenix, and Euclase held themselves out to King & Prince as "sister corporations" or "one and the same." In the absence of fraud, however, this avails Brookridge nothing. Corporations frequently blur inter-corporate distinctions seeking good will from customers and – again in the absence of fraud – little is made of it.

But that's not all, Brookridge argues urgently. Remember, it says, when Einarsson was questioned about these matters in the Rhode Island action, he claimed the Fifth Amendment privilege against self incrimination. Citing Lentz v. Metropolitan

Property and Cas. Ins. Co., 437 Mass. 23, 26-27 (2002), Brookridge argues this claim warrants drawing an adverse inference against Helgason and that this inference tips the scales on the issue of whether Seascape and Phoenix, Aquamarine/Euclase are all one.

This is an argument that has some traction. True, the Lentz precedent is not binding on this Court. In federal courts – even in diversity cases – the Federal Rules of Evidence govern, not their state analogs. Cameron v. Otto Bock 43 F.3d 14, 17-18 (1st Cir. 1994). Still Lentz contains a thorough and persuasive discussion of federal common law.

It is clear in federal courts that when a party claims the Fifth Amendment privilege, a court is warranted in drawing a negative inference against that party. Baxter v. Palmigiano, 425 U.S. 308, 318-319 (1976). This principle extends by natural implication to employees of a party if the employee's role in the dispute is material and the invocation may fairly be used against the employer in the circumstances. Data Gen. Corp v. Grumman Sys. Support Corp., 825 F.Supp. 340, 352-353 (D. Mass. 1993) (Skinner, J.) aff'd in part, 36 F.3d 1147 (1st Cir. 1994). Contrast Veranda Beach Club Ltd. Partnership v. Western Sur. Co., 936 F.2d 1364, 1374 (1st. Cir. 1991) (invocation inadmissible where evidence insufficient to indicate invoking witness motivated by anything other than personal reasons). In

appropriate circumstances, the same principle has been found applicable to former employees. Limone v. United States, 497 F. Supp.2d 143, 176 n. 77 (D. Mass. 2007)(Gertner, J.) aff'd 579 F.3d 79 (1st Cir. 2009). RAD Servs. Inc. v. Aetna Cas. & Sur. Co., 808 F.2d 271, 275, 278 (3d Cir. 1986). Brink's Inc. v. City of New York, 717 F.2d 700, 710 (2d Cir. 1983). The principle has been expanded even further by some courts to allow adverse inferences to be drawn against a party in cases where the invoking witness was neither an employee, former employee, or officer of the party opposing the evidence. *See* LiButti v. United States, 107 F.3d 110,123-124 (2d Cir. 1997) (father's invocation admissible to prove daughter's business was alter ego for his assets); Federal Deposit Ins. Corp. v. Fidelity & Deposit Co., 45 F.3d 969, 978 (5th Cir. 1995) (fraudulent loan recipient's invocation of privilege admissible in action against fidelity bond insurer of bank for fraudulent loans made by bank's lending officer). *See also* Rosebud Sioux Tribe v. A & P Steel, Inc., 733 F.2d 509, 520-521 (8th Cir. 1984), *cert. denied*, 469 U.S. 1072,(1984) (in suit by tribe against contractor on irrigation project, tribe could introduce invocation of privilege by chairperson of tribal corporation responsible for administration of tribal land who conspired with others to defraud tribe). *See* American Bar Assn. The right against self-incrimination in civil litigation (2001) at 6; Note, Adverse

Inferences Based on Non-Party Invocations: The Real Magic Trick in Fifth Amendment Civil Cases, 60 Notre Dame L. Rev. 370, 387 (1985); Heidt, The Conjurer's Circle – – The Fifth Amendment Privilege in Civil Cases, 91 Yale L. J. 1062, 1119-1120 (1982).

Applying these decisions to the case at bar, this Court concludes that legally it would be warranted in drawing an adverse inference against the Helgason entities and in turn could pierce the corporate veil.

But, having considered all the credible evidence and the reasonable inferences to be drawn therefrom, the Court declines to do so. The Court cannot, on this record, simply assume that Einarsson is an employee or former employee of Helgason or any Helgason controlled entity. He was, of course, a close business associate of Helgason's. Even so, in these circumstances, there are so many different plausible inferences to be drawn from Einarsson's claiming the Fifth that to draw a negative inference against Helgason or the Helgason controlled entities would be the sheerest speculation.

Brookridge is thus left with its claim that the Helgason entities were unjustly enriched by the Brookridge loans to Seascape.

Three elements must be established before a plaintiff may establish a claim based on unjust enrichment. These elements are: 1) A benefit conferred upon the defendant by the plaintiff;

2) An appreciation or knowledge by the defendant of the benefit; and 3) The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable (that is, unjust) for the defendant to retain the benefit without payment of its value. Usually, this means that the parties were dealing with each other in such a way, or in such circumstances, that reasonable people would expect payment by the defendant to the plaintiff for some benefit conferred by the plaintiff on the defendant. *Salamon v. Terra*, 394 Mass. 857, 859 (1985). “The benefit must be *unjust*, a quality that turns on the reasonable expectations of the parties.” *Community Builders, Inc. v. Indian Motocycle Assocs.*, 44 Mass. App. Ct. 537, 560 (1998). *See also Petters Company, Inc. v. BLS Sales, Inc.*, No. C 04-02160, 2005 WL 2072109 at *6 (N.D. Cal. August 25, 2005) (“In order to make out a claim for unjust enrichment [in a purchase order financing case], the plaintiff must show that the defendant received some benefit.”).

The fact that the Brookridge funds ultimately went to Chinese fish processing plants to satisfy Phoenix’ indebtedness to those plants for the purchase of some fish (other than the fish encompassed by the eleven purchase orders in question) does not prove that Phoenix was unjustly enriched, only that Seascape improperly used Brookridge funds to pay for other fish in contravention of its agreement with Brookridge.

Since Phoenix and Seascape had a business relationship of at least two years involving hundreds if not thousands of invoices and each also had long standing relationships – Phoenix with the Chinese fish processors and Seascape with King & Prince – it is very likely that Seascape covered Phoenix' indebtedness to the Chinese fish processing plants for fish ordered by Phoenix and shipped by it to the United States. Then, upon the delivery to King & Prince of such fish, King & Prince paid Seascape, the brokers took their commissions, and the purchase order financiers (if any) had their loans repaid with interest.

As to the fish that filled these eleven invoices, however, the funds necessary to enable these transactions came from an independent financier. These funds ultimately found their way to the Chinese fish processing plants, the fish was delivered by Aquamarine/Euclase to King & Prince who, in turn, paid Aquamarine/Euclase. Here too the brokers took their commissions and the purchase order financier had its loan repaid with interest.

In order for unjust enrichment liability to attach, a full accounting is necessary tracing the funds advanced by Brookridge and transferred out from Seascape to Phoenix and the Chinese fish processing plants (via Phoenix) and reciprocally tracing the funds into Seascape from any American producers who paid for fish delivered via Phoenix or any Helgason controlled entity. So long

as the transfers out and in are equal, Helgason and his entities have not been unjustly enriched. If, however, more Seascape funds advanced by Brookridge went out to Helgason controlled entities or, at his instance, went to Chinese fish processing plants for fish purchased by Phoenix, than were paid into Seascape for fish delivered via a Helgason controlled entity, then, to that extent, Helgason has been unjustly enriched at Brookridge's expense and it may recover such unjust enrichment from Aquamarine/Euclase.

Brookridge has proffered no such accounting, however, notwithstanding having been afforded access to Seascape's Frost National Bank records. The Court is left to conclude that, when Helgason learned from Einarsson that Seascape was unable to purchase the fish necessary to fill these eleven King & Prince purchase orders – Phoenix already having purchased some fish then en route from China to fill these orders – Helgason was acting as a prudent businessman in arranging for Aquamarine/Euclase to pay for fish that otherwise would have been left to be auctioned off on the docks in container-load lots.

**III. Conclusion**

For these reasons, judgment must enter for all the defendants and it is

SO ORDERED.

By the Court

/s/ William G. Young
William G. Young
District Judge